```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
CITY OF NEW YORK,                    :
                                     :
            Plaintiff,               :       03 Civ. 3256 (JSR)
                                     :
            -v-                      :
                                     :
PERMANENT MISSION OF INDIA TO THE    :
UNITED NATIONS, et al.,              :
                                     :
            Defendants.              :
------------------------------------ :
CITY OF NEW YORK,                    :
                                     :
            Plaintiff,               :       03 Civ. 6085 (JSR)
                                     :
            -v-                      :
                                     :
REPUBLIC OF PHILIPPINES, et al.,     :
                                     :
            Defendants.              :
------------------------------------ :
CITY OF NEW YORK,                    :
                                     :
            Plaintiff,               :       03 Civ. 6086 (JSR)
                                     :
            -v-                      :
                                     :
THE BAYARYN JARGALSAIKHAN, AS        :
PRINCIPAL RESIDENT REPRESENTATIVE TO :       OPINION AND ORDER
THE UNITED NATIONS OF THE MONGOLIAN  :
PEOPLE'S REPUBLIC, et al.,           :
                                     :
            Defendants.              :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

These three related cases pit the City of New York against

the governments of India, Mongolia, and the Philippines. The

subject, of course, is taxes.

Specifically, plaintiff the City of New York (the "City")

seeks to recover property taxes from the Republic of the Philippines

(the "Philippines"), the Permanent Mission of India to the United

Nations ("India"), and the Principal Resident Representative to the United Nations of the Mongolian People's Republic ("Mongolia") on portions of the buildings housing defendants' New York consulates and missions to the United Nations. With respect to the Philippines, the City says that taxes are due on portions of such property used for a restaurant, a bank, and an airline office. With respect to India and Mongolia, the City says that taxes are due for the portions of such property used as residences for employees below the level of head of mission. In response, defendants principally argue that these same portions of their property are exempt from taxation under the Vienna Convention on Consular Relations, 21 U.S.T. 77 (1963, ratified 1969), the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (1961, ratified 1972), customary international law, New York common law, and, as to the Philippines, section 418 of the New York Real Property Tax Law.

By way of background, after the City had assessed the taxes in question, the defendants refused to pay, whereupon, by operation of law, the tax assessments converted to tax liens against the properties. The City then brought these actions in 2003, seeking as to each defendant both a declaration that the liens are valid and a money judgment in the amount of the withheld taxes. The City sought the declarations, despite its admitted inability to foreclose on the properties, because (i) it believes that once the liens are declared valid the defendants may voluntarily choose to pay their tax liability; (ii) in the face of a valid court judgment, the United

States may reduce each defendant's foreign aid by 110 percent of the outstanding debt, see Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2006, § 543(a), 119 Stat. 2214; Consolidated Appropriations Act of 2005, § 543(a), 118 Stat. 3011; and (iii) the liens would be enforceable against subsequent purchasers. See Permanent Mission of India to the United Nations v. City of New York, 127 S. Ct. 2352, 2355 n.1 (2007).

Procedurally, these cases were originally assigned to the late Judge Richard Conway Casey, U.S.D.J. India and Mongolia then moved to dismiss on the ground that they were immune from this Court's jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 et seq. Judge Casey, however, concluded that he had jurisdiction pursuant to the FSIA's "immovable property exception," id. § 1605(a)(4), and that determination was then affirmed by the Second Circuit Court of Appeals, City of New York v. Permanent Mission of India to the United Nations, 446 F.3d 365 (2d Cir. 2006), and, ultimately, by the Supreme Court of the United States, Permanent Mission of India to the United Nations v. City of New York, 127 S.Ct. 2352, 2355 (2007).[1] Meanwhile, all parties filed motions for summary judgment, and these motions remained pending when, following Judge Casey's untimely death in 2007, the cases were transferred to the undersigned.

---

[1] The Philippines, although not moving to dismiss on the ground of want of jurisdiction, made a similar argument in papers it filed, prior to the Supreme Court's decision, in support of its instant motion for summary judgment. In light of the Supreme Court's subsequent decision, however, the argument is no longer tenable.

The Court now resolves those motions by holding, for the reasons discussed below, that the disputed portions of the residential property owned by India and Mongolia are subject to real estate taxation, as are the portions of the Philippines' property occupied by a bank office and an airline office, but that the portion of the Philippines' property used to house a restaurant is exempt from taxation.

I. India and Mongolia

The following facts are undisputed:

At all times here relevant, India owned a twenty-six story building located at 235 East 43rd Street, New York, New York. Plaintiff's Local Rule 56.1 Statement in No. 03 Civ. 3256 ("Pl. 56.1 - India") at ¶¶ 2-3; India's Local Rule 56.1 Counter-Statement in No. 03 Civ. 3256 ("Def. 56.1 - India") at ¶¶ 2-3. The first six floors of the building house the offices of India's Permanent Mission to the United Nations, while the upper twenty floors contain residential units for employees of the Mission and of the Indian Consulate, all ranking below the head of mission. Pl. 56.1 - India at ¶¶ 4, 6; Def. 56.1 - India at ¶¶ 4, 6. The employees are Indian citizens who receive housing from the mission rent-free in accordance with Indian law. Def. 56.1 - India at ¶ 17; Pl. Counter-Statement Pursuant to Local Rule 56.1 in No. 03 Civ. 3256 ("Pl. Counter-56.1 - India) at ¶ 17. The City has assessed property taxes on the residential portion, along with charges for sidewalk repairs and elevators. Pl. 56.1 - India, at ¶¶ 11-12. The City calculates that, as of September 12,

2007, the Mission owed $39,394,524.37 in property taxes and other charges, including interest. Id. at ¶ 15.

At all relevant times, Mongolia owned a six-story building located at 330 East 46th St., New York, New York. Plaintiff's Local Rule 56.1 Statement in No. 03 Civ. 6086 ("Pl. 56.1 - Mongolia") at ¶¶ 2-3; Mongolia's Local Rule 56.1 Counter-Statement in No. 03 Civ. 6086 ("Def. 56.1 - Mongolia") at ¶¶ 2-3. The first two floors of the building house offices of Mongolia's Permanent Mission to the United Nations, and the third floor contains the residence of Mongolia's Ambassador to the United Nations. Pl. 56.1 - Mongolia at ¶¶ 5-6; Def. 56.1 - Mongolia at ¶¶ 5-6. The remaining two floors are devoted to housing for employees of the Mission, all below the rank of head of Mission, and their families. Pl. 56.1 - Mongolia at ¶¶ 5-6; Def. 56.1 - Mongolia at ¶¶ 5-6. The City seeks to tax the top two floors only, and has calculated that, as of September 12, 2007, Mongolia owed $4,239,147.25 in property taxes, including interest, on that portion of the property. Pl. 56.1 - Mongolia, at ¶ 13.

Although India and Mongolia argue that the property used to house consular and diplomatic staff is exempt from taxation, their argument falters in the face of the plain language of the international conventions applicable to this issue. The tax status of the consular portions of the premises is controlled by Article 32 of the Vienna Convention on Consular Relations ("VCCR"), which provides:

> Consular premises <u>and the residence of the career head of consular post</u> of which the sending State or any person acting on its behalf is the owner or lessee shall

5

> be exempt from all national, regional or municipal dues
> and taxes whatsoever, other than such as represent
> payment for specific services rendered.

VCCR art. 32 (emphasis supplied). While India and Mongolia try to argue that the consular residences here in question are part of the "consular premises," Article 32, on its face, distinguishes for tax purposes between "consular premises" and "residence" and limits the tax exemption respecting residence to "the residence of the career head of consular post" and none other. As the Supreme Court stated in Sumitomo Shoji Am. v. Avagliano, 457 U.S. 176, 180 (1982), "Interpretation of [a treaty] must, of course, begin with the language of the [t]reaty itself. The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." (internal quotation marks omitted).

The tax status of the U.N. Mission portions of the premises is controlled by the Vienna Convention on Diplomatic Relations ("VCDR"). It reaches the same result as the VCCR but through a slightly more circuitous route. First, Article 1 of the VCDR defines "premises of the mission" as consisting of:

> the buildings or parts of buildings and the land
> ancillary thereto, irrespective of ownership, used for
> the purposes of the mission, including the residence of
> the head of the mission.

VCDR Art 1(i) (emphasis supplied). Then, Article 23 of the VCDR provides:

> The sending State and the head of mission shall be
> exempt from all national, regional, or municipal dues

and taxes <u>in respect of the premises of the mission</u>, whether owned or leased, other than such as represent payment for specific services rendered.

VCDR art. 23 (emphasis supplied).  These two provisions of the VCDR, when taken together, make plain that the residential exemption from taxes is limited to "residence of the head of the mission," and not to others.[2]

In short, the plain language of the VCCR and the VCDR unequivocally supports the City's position, and that is really the end of the matter.  Indeed, of the remaining arguments to the contrary proffered by India and Mongolia, only one even merits mention.  This is the argument that portions of the premises in issue are exempt from New York taxation by virtue of "customary international law" as construed as part of New York common law by the New York Court of Appeals in <u>Republic of Argentina v. City of New</u>

---

[2]  To the extent that the opinion in <u>United States v. County of Arlington</u>, 702 F.2d 485 (4th Cir. 1983), can be read as contrary to this analysis, it is not, in the Court's view, persuasive.  Moreover, <u>County of Arlington</u> was based in significant extent on the position then taken by the U.S. State Department, which the Department subsequently reversed.  Thus the State Department's current version of its publication <u>Foreign Diplomatic and Consular Personnel in the United States: Guidance for Administrative Officers</u> states that "[a]bsent a bilateral agreement, property tax exemption is not generally granted to residences owned by foreign governments used to house members of consular posts or international organizations" other than career heads of the consular posts or chiefs of missions to the international organizations.  U.S. Dep't of State, <u>Foreign Diplomatic and Consular Personnel in the United States: Guidance for Administrative Officers</u> § 7.8, at 7-3 to 7-4 (July 25, 2007), <u>at</u> http://www.state.gov/documents/organization/27910.pdf (cover and table of contents), http://www.state.gov/documents/ organization/27803.pdf (section 7, entitled "Real Estate Property Tax Exemptions"), Ex. A to Decl. of John R. Low-Beer in Support of Pl. Mot. for Summ. J. in No. 03 Civ. 3256 ("Low-Beer Decl. - India").

York, 25 N.Y.2d 252 (1969).  But despite some broad dicta in the opinion, the issue in Republic of Argentina was simply whether, under customary international law, consular premises were entitled to the same scope of exemption as diplomatic premises.  Now that, subsequent to Republic of Argentina, the U.S. has ratified the VCCR, it is that treaty, and not customary international law, that controls the scope of the consular exemption, just as it is the VCDR that controls the scope of the diplomatic exemption.

II. The Philippines

The following facts are, except where noted, undisputed:

In 1973, the Republic of the Philippines acquired 556 Fifth Avenue (the "Philippine Center") to house within its premises all of the Philippines' offices and agencies in New York City, including the Mission to the United Nations and the Consulate General.  Joint Statement of Undisputed Facts in 03 Civ. 6085 at ¶¶ 1-3 ("Joint Statement").  The Philippine Government established the Philippine Center Management Board (the "Management Board") to manage and operate the building.  Id. at ¶ 4.  At various times, portions of the premises were used for a restaurant, a bank, and an airline office. The City, relying on the Philippines' representation of the square footage used for these purposes, calculated that it was owed $19,017,691.17 in taxes as of September 16, 2005.

The Restaurant: Between 1974 and 1982, the cellar of the Philippine Center was occupied by Maharlika (or "the Restaurant"), a restaurant owned by the Philippine Government.  Id. at ¶ 9.

8

Maharlika, which served lunch and dinner to Philippine Center staff and to the public,[3] served authentic Filipino cuisine, employed Filipinos only, and was staffed with a Filipino dance troupe and musicians who performed a show during dinner. Id. ¶ 11-12; March 11, 1976 Letter of Price Waterhouse & Co. to Ernesto C. Pineda, Consul General of the Philippines ("PWC Letter"), Ex. 10 to Decl. of John Low-Beer in 03 Civ. 6085 ("Low-Beer Decl. - Philippines"). Through its culinary offerings and the evening performance, Maharlika showcased Philippine culture, folk art, ethnic music and dance to guests of the Mission and the Consulate General. Def. Statement Pursuant to Local Rule 56.1 at ¶ 12 ("Def. 56.1 - Philippines"); Pl. Counter-Statement Pursuant to Local Rule 56.1 at ¶ 12 ("Pl. Counter-56.1 - Philippines).

Two business corporations operated Maharlika over the course of the restaurant's tenure in the Philippine Center. In 1974, the Management Board entered into an agreement with Au Bon Vivant of the Philippines ("ABV") to lease the cellar space and operate Maharlika. Joint Statement at ¶ 14; Management Operation and Lease Agreement Between the Management Board and ABV (the "ABV Agreement"), Ex. 15 to Low-Beer Decl. - Philippines. The ABV Agreement stated that in contracting with ABV to operate the restaurant, the Philippine Center "ha[d] the objectives of enhancing the image of the Philippines by promoting Filipino culture and traditions which will encourage foreign tourists to visit the Philippines and create an expanding

---

[3] The parties dispute whether, and to what extent, Maharlika advertised to the general public.

market for Filipino products in the United States." Id. at PMB 0002. The Agreement provided that the Management Board would install "a completely equipped and furnished Filipino restaurant plus all accessories and incidentals – in effect, a 'turn-key' restaurant at basement level" and "[p]rovide cash advances for ABV's account . . . i.e; reasonable operating funds until the operation is self-sufficient," which ABV would repay each month to the extent they exceeded foreseeable cash requirements for the following sixty days. Id. at PMB 0002-03, 06. In exchange, ABV was to be "totally responsible for every phase of [the restaurant's] operation, management and supervision" and to "use its best efforts to assist the 'Philippine Center' [by operating the restaurant] as a 'showcase' of the Republic of the Philippines cultural heritage by providing New York City with the best of traditional Filipin[o] service, food and entertainment." Id. at 0003, 0005. The Management Board retained several rights under the Agreement, however, including the right to preempt the use of Maharlika for official functions upon five days' notice, the right to inspect the premises and all aspects of ABV's operation "to ensure the [Management Board's] objectives in establishing the [restaurant] are maintained," and the rights to the trade name "Maharlika." Id. at 0004-06. ABV was to receive a management fee of five percent of monthly sales. Id. at 0004.

ABV operated Maharlika until 1977, when a dispute over the cash advances gave rise to a "bitter struggle" between ABV and the Management Board. Memorandum on the Proposed Renewal of Maharlika Contract, from Ernesto Pineda, Consul General of the Philippines and

Chairman of PCMB, at PMB 0209, Ex. 16 to Low-Beer Decl. -
Philippines.  As a result of the dispute, ABV commenced litigation in
New York State Supreme Court, which was eventually settled.  The
parties' settlement agreement, among other things, terminated the
lease and management contract.  Joint Statement at ¶¶ 25-27;
Agreement Between the Management Board and ABV and Nora V. Daza, Ex.
17 to Low-Beer Decl. - Philippines.

Following the termination of the ABV Agreement, the
Philippine Department of Trade entered an agreement with Sulo
Management Company, Inc. ("Sulo") in July 1977.  Agreement (the "Sulo
Agreement"), Ex. 18 to Low-Beer Decl. - Philippines.  The Sulo
Agreement stated that both parties wished to maintain a restaurant
"that will project an image which is representative of the best in
Philippine life, culture and cuisine," and that "the primary
objective of the Philippine Government in setting up said restaurant
is not to make a profit for said Government but to provide a showcase
of the country's culture, and thereby encourage foreign tourists to
visit the Philippines and expand foreign markets for Philippine
products."  Joint Statement at ¶¶ 30-31.  Under the Agreement, Sulo
paid no rent but bore all operating costs, including utilities.
Joint Statement at ¶ 36.  The Philippine Government turned over to
Sulo all existing assets of Maharlika, such as silverware, linens,
furniture and equipment.  Sulo Agreement at PMB 0014-15.  The
Agreement also provided that Sulo would implement "suggestions . . .
for the betterment of the business" by the Philippine Commercial

Attache to the extent they were practicable and consonant with general restaurant practices. Sulo Agreement at PMB 0016.

In 1981, the parties executed a second agreement on substantially the same terms, although this agreement additionally provided that Sulo would shoulder the costs of "taxes and assessments relative to restaurant operations that may accrue in favor of the U.S. Government or any of its instrumentalities." Memorandum of Agreement, Ex. 19 to Low-Beer Decl. - Philippines. Sulo did not pay any rent under the second agreement; that Agreement provided that in case of future renewal, the agreement would not be rent-free, but the agreement was never renewed. Joint Statement at ¶ 40. In December 1982, Sulo wrote to the Management Board stating that Sulo had been advised of the intent of the Management Board to bill rental fees retroactive to 1977, which Sulo stated was not stipulated in the contract. Id. at ¶ 41. Sulo advised it would turn over the restaurant on January 1, 1983. Id. Maharlika closed at the end of 1982. Id. ¶ 42. In October 1986, the Management Board sent a letter to Sulo requesting payment of $108,192.81 for Sulo's share of utility and garbage hauling charges. Id. at ¶ 43.

The Bank: On November 5, 1987, the Management Board entered into an agreement with the Philippine National Bank ("PNB" or the "Bank") whereby the Bank agreed to lease for five years the cellar space formerly occupied by Maharlika.[4] Joint Statement at ¶ 45. The

---

[4] PNB was established in 1916 and functioned as the central bank of the Philippines until 1949. Republic of the Philippines' Statement of Undisputed Facts Pursuant to Local Rule 56.1, at ¶ 33 ("Pl. 56.1 - Philippines"); Pl. Counter-Statement Pursuant to

annual rent was $70,000 ($16 per square foot of space) for the first

year and was scheduled to escalate each year, up to $110,000 in the

fifth year.  Id. at ¶ 46.  A rider to the lease provided that "[t]he

TENANT shall pay for the taxes due on the entire premises leased to

it."  Agreement of Lease at PHI1142, Ex. 29 to Low-Beer Decl. -

Philippines.[5]

In 1992, PNB and the Management Board began discussions

concerning the renewal of PNB's lease, which continued until late

1995.  Joint Statement at ¶ 49.  The parties disagreed on renewal

terms in a number of respects, including but not limited to the

rental rate and the amount of real estate tax for which the Bank

should be held liable.  See  Letter from Pedro Reyes, Acting General

Manager of the Philippine National Bank, dated November 25, 1994, at

PMB 0147, Ex. 26 to Low-Beer Decl. - Philippines; Memorandum from

_____

Local Rule 56.1, at ¶ 31 ("Pl. Counter-56.1 - Philippines");
History of Philippine National Bank, at http://www.pnb.com.ph/
history.asp ("PNB Website"), Ex. 57 to Rep. Low-Beer Decl. -
Philippines; Tr. at 83.  PNB remained wholly government-owned
until 1989, when the Government's ownership decreased to seventy
percent.  In 1996, the Government's ownership decreased still
further, to forty-six percent.  See PNB Website; Pl. 56.1 at ¶
35.

   [5]  The provision provided in full:
   The OWNER hereby warrants that there are no outstanding
   and unpaid taxes on the land and building on which the
   leased premises form a part, except real estate taxes
   assessed by New York City, which are being contested by
   OWNER; and that the OWNER shall hold the TENANT harmless
   of any such outstanding and unpaid taxes; The TENANT
   shall pay for the taxes due on the entire premises leased
   to it.
Agreement of Lease at PHI1142.  This paragraph seemingly reflected
the intention of the Management Board to hold PNB accountable for
any taxes assessed on the property in the future.

Manuel Valdehuesa, Secretary/Manager of the Management Board, to
Manager of PNB, dated Feb. 15, 1995, Ex. 28 to Low-Beer Decl. -
Philippines; Transcript of September 17, 2007 Hearing ("Tr.") at 75-
76.[6]  During the period following the expiration of the original
lease, the Management Board accepted rental payments from PNB under
protest, claiming that they were too low.  See Letters and Related
Correspondence Between PCMB and PNB from October 1992 to April 1996,
Ex. 59 to Rep. Decl. of John Low-Beer ("Rep. Low-Beer Decl. -
Philippines").  The lease was never renewed, and PNB vacated the
premises in May 1996.  Joint Statement at ¶ 51; Correspondence from
PNB to PCMB, Ex. 33 to Low-Beer Decl. - Philippines.  In the several
years that followed, PNB and the Management Board engaged in a
protracted struggle over rental arrears PCMB claimed that PNB owed
it.  The Management Board referred PNB's account to a collection
agency and the parties ultimately settled the claim.  Correspondence,
Ex. 35 to Low-Beer Decl. - Philippines; Tr. at 63.

During the period of PNB's tenancy at the Philippine Center,
PNB acted as a fiscal agent of the Philippine Government, in that the
Government maintained accounts there, including accounts of
Philippine embassies and consulates in the United States and

---

[6]  On September 17, 2007, the Court held a hearing to
determine which material facts the parties actually disputed.
See Fed. R. Civ. P. 43(e).  If a witness at that hearing
presented a fact that neither side challenged in any way, the
Court assumes for the purposes of these motions that the fact is
undisputed.

elsewhere.  Tr. at 19, 51-52.[7]  PNB was one among several banks
serving as an official depository of the Philippine Government.  Tr.
at 51-52.[8]

The Philippine Center branch of PNB offered a variety of
services both to the Consulate and its staff and to members of the
New York-area Filipino community.  Tr. at 11.  The bulk of the Bank's
activities involved transferring funds from Filipinos in New York to
their friends and relatives in the Philippines.  Tr. at 11.
Additionally, the Bank offered loans both to Philippine Government
entities, including the Philippine Consulate General, and, on at
least three occasions, to small private businesses.  Tr. at 20, 24,
41.  The Bank offered basic checking and saving accounts, although
the total sums contained in those accounts were far lower than the
sums contained in Government accounts.  See Tr. at 21-22; Financial
Statement of Philippine National Bank, 1989, Ex. to Letter from John
J.P. Howley to the Court, dated Sept. 27, 2007 ("Howley Letter").
The Bank also provided "settling loans" to Filipino recipients of H-1
visas upon their arrival in the United States.  Tr. at 22-23.  The

---

[7]  The Philippines and the City dispute whether the Bank
also provided payroll services to the Consulate, see Def. 56.1 at
¶ 38; Pl. Counter-56.1 - Philippines at ¶ 38, and "administered
government-approved budgets and transfers of funds from the
Philippine government in Manila to the Consulate, UN Mission,
other government offices in the building, and the Philippine
Embassy in Washington, D.C.," see Def. 56.1 at ¶ 37; Pl. Counter-
56.1 - Philippines at ¶ 37.

[8]  A different bank, the Bangko Sentral ng Pilipinas, serves
as the central bank of the Philippines.  See Website of the
Bangko Sentral ng Pilipinas, Ex. 58 to Rep. Low-Beer Decl. -
Philippines.

Bank's records indicate that by far the largest number of loans issued were to Filipino nationals working as nurses.  See Print-Out of All Loans Issued by Philippine National Bank, New York Branch, 1987 to 1995, Ex. to Howley Letter.

The Bank had a small brass plaque on the outside of the Philippine Center; at one point the Bank expressed interest in posting a larger advertisement but never did so.  Tr. at 31, 59.  The Bank was open at times the consular offices and other government entities in the Philippine Center were closed, for example, on Saturdays.  Tr. at 73-74.[9]

The Airline: From 1974 to 1988, Philippine Airlines ("PAL" or the "Airline") occupied an office on the fourth floor of the Philippine Center.  Joint Statement at ¶ 52.  As of January 1, 1988, PAL paid annual rent for this space in the amount of $49,650.  Id. at ¶ 53.  According to a Philippine Center document dated February 19, 1975, PAL utilized this space "for administrative and outside promotion contacts."  PAL had a separate ticketing office at Rockefeller Centre.  Id. at ¶ 54.  This ticket office was temporarily

---

[9]  The Philippines claims, based on a declaration of Gavino Abaya, Jr., the current Manager of the Philippine Center and an employee, during the relevant time period, of the Philippine Mission to the United Nations, that "[t]he presence of PNB within the Philippine Center facilitated the coordination of the government's programs to stimulate investment and development in the Philippines, as the bankers were immediately available to the special trade representatives and other government officers." Decl. of Gavino Abaya at ¶ 11, Ex. 1 to Pl. Motion for Summ. J. But neither Abaya nor the Philippines has provided any admissible evidence to support this speculative and conclusory assertion, and the Bank's General Manager made no mention of it in the September 17 hearing.

located in the Philippine Center.  Correspondence, Ex. 42 to Low-Beer
Decl. - Philippines.  PAL did not advertise its Philippine Center
office on signs inside or outside the building, and the only
individuals permitted to enter the office freely were Philippine
Center staff.  Tr. at 93; Abaya Decl. at ¶ 17, Ex. 1 to Pl. Motion
for Summ. J.[10]

Against the foregoing factual background, the Philippines
argues that the portions of the Philippine Center used to house the
restaurant, the bank branch, and the airline office should be exempt
from taxation, not only under the VCCR, the VCDR, and the Republic of

_____

[10]  The Philippines' 56.1 Statement makes a number of other
claims pertaining to PAL, but none of them qualifies as a
genuinely undisputed fact supported by admissible evidence.  For
example, the Philippines claims that the Philippine Government
owned PAL during the time of its tenancy in the Philippine
Center.  Def. 56.1 at ¶ 44.  As the City notes, however, the
"History of PAL" posted on the Philippine Airlines' website
directly contradicts this statement.  See "Milestones in the
History of PAL," at http://www.philippineairlines.com, Ex. 38 to
Low-Beer Decl. - Philippines (stating that in January 1965 the
"Government relinquishes control of PAL" and an individual
"acquires a majority stake in the airline," and that in November
1977 the "Government reassumes control of PAL").  The Philippines
also presents as a fact Abaya's statement that the PAL office was
located near the Philippine Government's Tourism and Trade
Representatives "in order to promote trade, investment and
tourism with the Philippines."  Abaya Decl. at ¶ 16, Ex. 1 to Pl.
Motion for Summ. J.; see also Def. 56.1 at ¶¶ 45-46.  But there
is no suggestion that Abaya had the slightest personal knowledge
to support this conclusory statement, and it therefore is not
properly before the Court on these cross-motions.  Similarly,
Abaya's Declaration states that the PAL office "was accessory to
and in support of the governmental activities of the Mission, the
Consulate and the Embassy in Washington, D.C. in that it provided
secure travel arrangements for the Philippine First Family and
other senior government officials and diplomats (acting as the
equivalent of White House Travel Office/Air Force One)"; but when
asked about the First Family's travel on PAL in his deposition,
Abaya stated that "I have no knowledge of that."  Abaya Dep., Ex.
60 to Low-Beer Rep. Decl. - Philippines.

17

Argentina case, but also under section 418 of the New York Real
Property Tax Law ("RPTL").  That section exempts from taxation
property owned by a foreign government and "used exclusively for the
purposes of maintaining offices" for that country's "principal
resident representative or resident representative with the rank of
ambassador or minister plenipotentiary of such foreign government to
the United Nations or other such world-wide international
organization," or for "offices for the staff of such
representatives."  On its face, this section would seem directly to
contradict the Philippine's position, since it exempts only property
used "exclusively" as "offices" of the permanent representative to
the United Nations or that person's staff.  But the Philippines
argues that it should not be read literally.  For example, it argues
that "exclusively" should be read, mirabile dictu, to mean
"primarily."  While New York courts are not wholly immune to such
legerdemain, see Ass'n of the Bar v. Lewisohn, 34 N.Y.2d 143, 153
(N.Y. 1974), this Court will not assume, absent a direct holding by a
New York court, that when the New York legislature used the word
"exclusively" in section 418, it did not mean what it said.[11]

        The Court likewise rejects the Philippines' argument (also
made by India and Mongolia) that Republic of Argentina supplies an

---

        [11]  While the Philippines also argues that section 418 was
somehow intended, despite its literal language, to extend tax
exemption to the fullest limit permitted by international law,
that interpretation, besides being contrary to elementary rules
of statutory construction, would not extend the exemption beyond
limits set by the now applicable treaty law, the VCCR and the
VCDR.

independent source of tax exemption, since, as previously discussed, that decision, which preceded ratification of the VCCR, cannot establish, under the rubric of "customary international law," a tax exemption that is not found in the treaties that now more specifically address the issue, the VCCR and the VCDR.

The Court therefore turns to consideration of those two Conventions.  As previously discussed, these treaties directly address the issue of which residences are exempt from taxation.  By contrast, however, they do not directly address the tax status of the premises at issue in the case of the Philippine Center.  Instead, they simply specify that tax exemptions apply to portions of the consular premises "used exclusively for the purposes of the consular post," VCCR art. 1(j), and mission premises "used for the purposes of the mission," VCDR Art 1(i).

Since the Philippine Center operated both as a consulate and as a U.N. Mission, both the VCCR and the VCDR must be examined; but here there are important differences between the two.  The VCCR in effect defines the purposes of a consular post broadly, by reference to its functions, i.e., "furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State," "protecting in the receiving State the interests of the sending State and of its nationals," "ascertaining . . . conditions and developments in the commercial, economic, cultural and scientific life of the receiving state, reporting thereon to the Government of the sending state," and "helping and assisting nationals, both individuals and bodies corporate, of the

sending State." VCCR art. 5(a), (b), (c) & (e).  Consulates also take
care of a number of administrative matters, such as issuing passports
and travel documents and acting as a notary, and safeguard the legal
rights of nationals of the sending state by, for example, arranging
legal representation, protecting minors, and assisting the crews of
vessels and aircraft.  Id. art. 5(d), (f), (h), (i), (l).

However, precisely perhaps because such functions or purposes
are so broadly defined, the VCCR limits tax exemption to those
portions of the consular premises used "exclusively" for these
purposes.  Id. art. 32.  By contrast, the modifier "exclusively" is
absent from the corresponding provision of the VCDR; but that may be
because the VCDR limits the tax exemption to portions of the property
used for the purposes of the mission (in this case, the Mission to
the United Nations), which are traditionally much more limited than
consular functions.

With respect to the Bank, it is true that the branch provided
some banking services to the Philippine Government and to the
Consulate specifically, that it acted as an official depository of
the Philippine Government, and that it may have provided payroll
services to the Consulate and transferred funds between the
Philippine Government and the Consulate.[12]  But the fact that a
commercial entity happens to render services to a consulate in the
latter's fulfillment of its functions does not mean that the entity
itself is exercising consular functions.  See VCCR art. 3.

_____

[12]  As noted, the evidence of these last purported functions
is disputed.

20

Otherwise, any phone company that ran a line through a consulate could be said to be exercising consular functions, which is absurd.[13]

In any event, the Bank did not "exclusively" serve the Consulate or the Philippine Government. Indeed, the General Manager of the Bank testified that the "bulk" of the Bank's activities on the premises consisted of assisting individual Filipino customers in New York in sending personal remittances to the Philippines. Tr. at 11. In that same vein, by far the greatest number of loans provided by the Bank were to Filipino nationals in the United States. Although these services undoubtedly "assist[ed] . . . nationals . . . of the sending state," this was assistance provided by the Bank to the Bank's customers because they were the bank's customers, not assistance provided by the consulate to nationals of the sending state because they were such nationals.

The Management Board's own dealings with PNB make evident that the Philippine Center considered PNB essentially a commercial tenant. Thus, the Center charged PNB rent to occupy the cellar space at a rate both parties understood to reflect the property's market value. Furthermore, during the period following the expiration of the original lease, the parties engaged in an extended dispute over the rent PNB owed, a dispute which continued for several years following PNB's departure from the premises. So intractable were the

_____

[13]    While the Philippines also claims that the Bank partnered with the Philippine trade representative and other officers to carry out the consular functions of promoting "trade and investment," see Def. Mem. of Law at 19, it offers no admissible evidence to support this conclusion.

parties' differences over the amount of rent owed that PCMB
ultimately referred PNB to a collection agency.  Such conduct is
simply inconsistent with the idea that PCMB leased the space to the
Bank not as a commercial tenant but in order to serve "the purposes
of the consular post."

There are additional indications that PCMB considered the
Bank to be an entity separate from the Consulate itself.  Thus, the
rental agreement itself provided that the Bank would pay all real
estate taxes assessed in the future; such real estate taxes would
only become due if the property were outside the exempt "consular
premises."  Also, the Embassy of the Philippines, in a Diplomatic
Note to the United States Department of State, requested permission
to rent the cellar space to PNB "for its normal banking activities."
Diplomatic Note No. 0080487 (Apr. 7, 1987), Ex. 24 to Low-Beer Decl.
- Philippines.  The Embassy informed the State Department that the
portion of the property to be leased to the Bank was "for all intents
and purposes . . . a separate unit" and therefore requested whether
the Embassy could "proceed with the lease and maintain the immunity
of the rest of the building."  Id. (emphasis added).  Presumably, the
Philippines' Embassy was referring to Article 31 of the VCCR, which
grants inviolability to "consular premises."  The Diplomatic Note
therefore reflects the Embassy's position that once the property was
leased to the Bank, it would no longer form part of the "consular
premises."

In short, while it was no doubt beneficial to the Consulate
to have the PNB branch located within the Philippine Center, that

22

fact is far from establishing that the Bank "exclusively . . .
[served] the purposes of the consular post."[14]  Accordingly, the VCCR
does not extend tax exemption to the property leased by the Bank.

As for the VCDR, in order for the Bank to enjoy exemption
under that convention, the Bank office would have to be used "for the
purposes of the mission" -- here, the diplomatic purposes of the
Philippines' Mission to the United Nations.  The Philippines has
advanced no basis on which the Bank plausibly could be seen to serve
such purposes, as opposed to consular purposes.

The Airline, like the Bank, was a commercial tenant whose
presence in the Philippine Center was convenient for the Philippines,
but whose office was not part of the "consular premises."  Like the
Bank, the Airline provided some services to the Consulate and to the
Philippine Government, and some of these may have had the effect of
promoting travel to the Philippines.  On the Philippines' own
submission, however, the PAL office in the Philippine Center
essentially functioned as a back office and generally supported the
Airline's primary commercial mission; it therefore makes sense that
PAL paid the PCMB rent for the privilege of maintaining an office for
this purpose.  For the same reasons as the Bank, therefore, the
Airline office was not used exclusively for consular purposes.

Similarly, the Philippines has adduced no reason why the PAL
office could be said to serve the diplomatic purposes of the Mission

_____

[14]  For example, it might be convenient for the Consulate to
have a shoe repair establishment in the building, or a coffee
shop, but presumably a state could not plausibly argue that such
ventures were part of the consular premises.

to the United Nations. It may also be noted that the U.S. State Department, in a Diplomatic Note sent from the State Department to all Permanent Missions to the United Nations, expressly stated that portions of a United Nations Mission building occupied by "the offices of the national airline [or] other government corporations of a commercial nature" are not tax-exempt. Diplomatic Note No. HC-12-01 (April 5, 2001), Ex. 47 to Low-Beer Decl. - Philippines.

Maharlika Restaurant, however, differs from the PNB branch and the PAL office in several critical respects. To begin with, it was clear from the outset that Maharlika was not intended to be a commercial venture. Neither ABV nor Sulo ever paid rent to the Philippine Center, and, indeed, the lease agreements with both entities specified that the Management Board's purpose was to operate a restaurant to showcase Filipino culture, not to earn a profit.[15] Essentially, the Management Board arranged with ABV and Sulo to operate a restaurant in the Philippine Center that the Management Board had established for its own purposes. A variety of other evidence further supports this conclusion: for example, the Restaurant had only Filipino employees, presented a single long

_____

[15] It is true that following the termination of the ABV Agreement, and to a lesser extent following the Sulo Agreement, the parties seem to have engaged in a dispute over the financial obligations of the parties. But such a dispute is not inconsistent with the idea that the Management Board entered into contracts with the companies essentially to operate the consulate's restaurant. And the fact that the Management Board intended to charge Sulo rent on any further renewal of its lease indicates, at most, that the Management Board contemplated changing Maharlika's mission from the role it played since its inception.

dinner show, and occasionally had to cancel patrons' reservations so
that Philippine officials could host functions, when all of these
arguably decreased the entity's profitability.  See PWC Letter at PMB
0028-29.  The Philippines also retained various mechanisms of
controlling the Restaurant to ensure that it served its desired
purpose, such as the right of inspection and a requirement that the
Restaurant implement practicable suggestions by the Philippine
Commercial Attache.  In other words, unlike the PNB branch and the
PAL office, which functioned more or less as a bank and an airline
whose offices happened to be in the Philippine Center, Maharlika
functioned like a Philippine Center restaurant that ABV and Sulo
happened to run.  Maharlika was thus used exclusively for a consular
purpose, and so is exempt under the VCCR.

        For the foregoing reasons, the Court grants summary judgment
to the Philippines dismissing the City's claims for taxes premised on
the portion of the premises occupied by the restaurant Maharlika, and
dismiss the corresponding City motion.  In all other respects,
however, the Court grants the City's motions for summary judgment
validating the liens and assessing taxes against the Philippines,
India, and Mongolia, and dismisses the defendants' corresponding
motions.  Counsel for the City should submit to the Court by no later
than February 13, 2008 a letter setting forth the amounts due to the
City as a result of these rulings, including the specification of any
interest due through February 21, 2008.  Defendants should submit to
the Court by no later than February 19, 2008, a letter specifying any

objections to the calculations.  The Court will then enter Final

Judgment on February 21, 2007.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        February 8, 2007